611 A.2d 360

UNION PAVING COMPANY, Petitioner,

· v.

COMMONWEALTH of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 7, 1992.

Decided June 4, 1992.

Richard D. Birns, for petitioner.

Bart J. DeLuca, Jr., Sr. Deputy Atty. Gen., for respondent.

Before COLINS and PALLADINO, JJ., and BARRY, Senior Judge.

COLINS, Judge.

Before the Court is an appeal of Union Paving Company (Union Paving) from an order of the Board of Finance and Revenue (Board) sustaining in part the sales and use tax assessment imposed against Union Paving by the Department of Revenue (Department).

As the result of an audit of Union Paving conducted by the Department, Assessment No. A–07035 was issued against Union Paving, which consisted of assessed sales and use tax for the period June 1, 1981, through June 30, 1984, in the amount of $82,098.65 plus interest and penalties. As will be set forth in greater detail in the Court's findings of fact, all undisputed portions of the assessment have been paid leaving only the disputed use tax assessment on wheel loaders and replacement parts in the amount of $16,831.17 and the use tax assessment on fuel oil consumed in the wheel loaders in the amount of $6,428.36. The sole issue before the Court is whether a wheel loader is predominantly directly used in the process of manufacturing asphalt within the meaning of Section 201(c) of the Tax Reform Code of 1971 [1] (Code) and, therefore, qualifies for the exclusion from Pennsylvania Sales and Use Tax provided in Sections 201(k) and 201(o) of the Code, 72 P.S. §§ 7201(k) and (o).

Appeals to this Court from determinations of the Board are governed by Pa. R.A.P. 1571, which provides for de novo review. Pursuant to Pa. R.A.P. 1571(f), the Board does not certify a record to us; instead, the parties are directed to file a stipulation of facts and to identify disputed facts. If necessary, the Court holds an evidentiary hearing pursuant to Pa.

---

1. Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7201(c).

R.A.P. 1542(b) for the development of the record in resolving those facts in dispute.

The parties hereto filed a stipulation of facts on May 6, 1991. Therein, the parties agreed that Union Paving's "production of bituminous paving products at each of its asphalt plants constitutes 'manufacturing' within the meaning of Section 201(c) of the Tax Reform Code of 1971." However, the parties are not in agreement as to "what constitutes 'the first production stage' of the manufacturing process within the meaning of Section 201(c)(1).... [Union Paving] contends that the wheel loaders are predominantly used during and after the first production stage, and prior to the completion of manufacturing. [The Commonwealth] contends that the wheel loaders are predominantly used prior to the first production stage or after the completion of manufacturing." Stipulation of Facts, No. 13.

The Court heard testimony and received evidence on this issue on September 23, 1991. The stipulation of facts entered into by the parties on May 6, 1991, is hereby adopted by the Court as its findings of fact and is as follows:

## "STIPULATION OF FACTS

1. The Petitioner, Union Paving Company ("Union") is a Delaware corporation principally engaged in (i) stone quarrying, (ii) the manufacture of bituminous paving materials and (iii) road surfacing. Union's principal place of business is located at Willow Grove Avenue and Limekiln Pike, Glenside, Pennsylvania 19038.

2. Union is a wholly-owned subsidiary of Glasgow, Inc., a Pennsylvania corporation, which purchased 100% of the stock of Union on or about February 1, 1985.

3. As a result of an audit of Union conducted by the Department of Revenue, Union was issued Assessment No. A–07035. The assessment related to the period June 1, 1981, through June 30, 1984, and assessed sales and use tax in the total amount of $82,098.65 plus interest and penalty. Elements of the assessment included use tax on fuel oil in the

amount of $28,582.21; use tax on wheel loaders and replacement parts therefor in the amount of $16,831.17; use tax on other goods and services in the amount of $22,873.75; and sales tax in the amount of $13,811.52.

4. Union did not contest and has paid the sales tax assessment in the amount of $13,811.52.

5. Within the time provided by law, Union filed a petition for reassessment with the Board of Appeals. The Board of Appeals reduced the use tax assessment on other goods and services by the amount of $15,837.08, and thus reduced the total assessment to $66,261.57 plus interest and penalty. The Board of Appeals denied Union's petition for reassessment of the use tax on fuel oil, the use tax on wheel loaders and replacement parts, and the balance of the use tax on other goods and services, and denied Union's request for abatement of the penalty by a decision mailed to Union on September 25, 1985.

6. Union filed a timely Petition for Review with the Board of Finance and Revenue, Docket No. RST–9296501120 SUT. In a decision dated March 25, 1986, the Board of Finance and Revenue reduced the assessment of use tax on fuel oil by the amount of $22,153.85, and thus reduced the total assessment to $44,107.72 (including sales tax of $13,811.52 which had been paid and use tax of $30,296.20) plus appropriate interest, and reversed the Board of Appeals regarding the penalty. The Board denied Union's petition for reassessment of the use tax on wheel loaders and replacement parts ($16,831.17), the use tax on fuel oil consumed in the wheel loaders (determined to be $6,428.36), and the balance of the use tax on other goods and services ($7,036.67).

7. Union ceased to contest and has paid the remaining use tax assessment on other goods and services in the amount of $7,036.67.

8. The sole issue before the Court is whether use tax was properly assessed on Union's use of wheel loaders, replacement parts therefor and fuel oil therein. The parties agree that such use tax was properly assessed if the wheel loaders

are *not* predominantly directly used in manufacturing, within the meaning of Section 201(c) of the Tax Reform Code of 1971. They further agree that no use tax should have been assessed on the wheel loaders, parts and fuel, if the wheel loaders *are* predominantly directly used in manufacturing.

9. Union produced bituminous paving materials during the audit period at six plants in four Pennsylvania locations: Spring House 1 and 2, in Spring House, Pennsylvania; Beach Street 1 and 2, in Philadelphia; Freeborn, in Springfield, Pennsylvania; and Bridgeport, in Bridgeport, Pennsylvania.

10. At each of Union's asphalt plants, Union employs at least one wheel loader, which is a heavy wheeled vehicle resembling a bulldozer, but fitted in front with a bucket or scoop instead of a shovel-like plate. A picture of a wheel loader is attached as Exhibit A.

11. Asphalt is a bituminous paving product consisting of coarse aggregate (i.e., rock), fine aggregate (i.e., sand), and asphalt cement, which is a bonding agent. Asphalt cement is a heavy petroleum product which begins to solidify at temperatures below approximately 200 degrees F.

12. Each of Union's asphalt plants produces approximately twenty-five different paving products. Each product consists of a particular mix of three to six types of sand or gravel aggregate together with asphalt cement. The specifications for each product are prescribed by the Pennsylvania Department of Transportation in its Publication 408, *Specifications* (1987), Section 400, for products to be used in Pennsylvania, and by the New Jersey Department of Transportation or Delaware Department of Transportation in similar publications for products to be used in New Jersey or Delaware.

13. The parties agree that Union's production of bituminous paving products at each of its asphalt plants constitutes "manufacturing" within the meaning of section 201(c) of the Tax Reform Code of 1971. The parties do not agree as to what constitutes "the first production stage" of the manufacturing process within the meaning of section 201(c)(1) of the Tax Reform Code of 1971. Petitioner contends that the wheel

loaders are predominantly used during and after the first production stage, and prior to the completion of manufacturing. Respondent contends that the wheel loaders are predominantly used prior to the first production stage or after the completion of manufacturing.

14. Union employs approximately nine different types of sand and gravel aggregate in its asphalt production operations. The nine different types of sand and aggregate are as follows: [1] natural sand, [2, 3] two varieties of crushed stone sand (carbonate and noncarbonate), [4] one-quarter inch aggregate, [5] one-half inch aggregate, [6] five-eighths inch aggregate, [7] three-quarter inch aggregate, [8] skid-resistant one-half inch aggregate, and [9] recycled asphalt pavement ("RAP").

15. Each of Union's asphalt plants consists of a paved area several acres in extent, on which equipment, a central structure, a control house, raw materials, and cold mix product in curing piles are situated. The central structure consists of (1) a series of "cold bins" which feed sand and aggregate onto a conveyor leading up to the "dryer," (2) a dryer in which the sand and aggregate are heated and dried, (3) a series of vibrator screens and "hot bins" which feed the dried sand and aggregate through the weigh hopper, together with RAP, into a "mixer," and (4) the mixer where dried sand and aggregate and RAP are mixed with asphalt cement. Adjacent to the central structure is a control house. The paved area surrounding the central structure is used for blending and storage of both tested and untested sand, aggregate, and RAP; for operations of the wheel loader or loaders; and for curing. This area is paved to avoid contamination of raw and partially manufactured materials, and finished product. A schematic diagram of a typical asphalt plant is attached as Exhibit B.

16. Government specifications require the laboratory testing of substantially all raw materials used in Union's plants for chemical composition, gradation and cleanliness. Dry, solid raw materials are delivered by truck to Union's plants and deposited on the paved areas in piles. Gravity causes the heavier pieces of aggregate and particles of sand to come to

rest towards the bottom of each pile. Wheel loaders are used to blend the raw materials in each pile, thereby creating a more uniform consistency of sand or aggregate within the pile. Random samples of each pile of sand or aggregate are then removed for laboratory testing. Wheel loaders are not used in laboratory testing. If the tested samples are deemed satisfactory, raw materials in the pile can be mixed with other raw materials in the next stage of the process. If the tested samples are not deemed satisfactory, wheel loaders are used to blend further the piles in order to achieve the uniform consistency required by customer specifications. To blend a pile of raw material, the wheel loader scoops up a portion of the raw material from the bottom of the pile, places it on the top of the pile and repeats the process until the pile is mixed with a uniform consistency.

17. The bituminous paving materials produced by Union include "hot mixes," which are delivered to customers' trucks directly from the mixer, and "cold mixes." Hot mix products must be used within approximately three hours after delivery because they lose workability in cooling. Cold mix products, in contrast, remain workable when cooled because the asphalt cement used in cold mix products contains an additive such as naphtha or fuel oil.

18. Cold mix products are not deliverable to the customer until after curing. Curing is the process by which the chemical coating of sand and aggregate is absorbed by the material as it cools, thus insuring that the product will not "strip" and become useless. Curing takes place in a curing pile which is located on the paved portion of the asphalt plant. The curing pile is limited to four feet in height to avoid a "chimney effect" whereby the heated emulsifying agent evaporates, then condenses and washes the coated aggregate as it descends. Wheel loaders are used to remove cold mix material from the mixer and convey it to these curing piles. Wheel loaders are also used to transfer cold mix products from a curing pile to customers' trucks.

19. The plant operator, working in the control house, controls the asphalt production process. He determines,

based on customer orders, the particular paving product which is to be manufactured. He then communicates to the wheel loader operator by two-way radio the types of sand, RAP or aggregate required for the particular paving product to be manufactured and the proportion of each such material needed in order to manufacture the product. In the case of RAP,. the wheel loader removes the required amount of RAP from its pile and conveys the RAP to the weigh hopper, and then to the mixer, by depositing the RAP into the RAP bin which empties onto the RAP conveyor belt running to the weigh hopper. In the case of sand or aggregate, the wheel loader removes these materials from their piles in the required proportions and conveys the materials to the dryer by depositing the materials into a set of "cold bins" which empty onto a conveyor belt running to the dryer.

20. The cold bins are cone-shaped bins which serve as funnels. The diameter of the wider opening at the top of each cold bin corresponds to the width of a wheel loader scoop. The diameter of the smaller opening at the bottom of each cold bin corresponds to the width of the conveyor. In order to convey sand and aggregate to the dryer without spillage, the wheel loader deposits these materials into the cold bins. The capacity of each cold bin is approximately twenty tons, or the equivalent of between five and six scoops of material from the wheel loaders. The contents of a cold bin empty out to the conveyor in five to fifteen minutes of plant operation.

21. When the particular paving product being produced requires a number of types of sand and gravel aggregate not exceeding the number of cold bins, the loader places the proper proportion of each type of material in a different cold bin. When the product requires more types of sand and aggregate than the number of cold bins, the wheel loader must mix two or more materials on the ground prior to putting the mixed material into a bin.

22. When the plant converts from producing one asphalt product to another, the plant operator communicates to the wheel loader operator the changed requirements for raw materials. If the proportion but not selection of raw materials

has been changed, the wheel loader must change only the rate at which it conveys the various materials to the cold bins. If the product change also involves a change in the selection of raw materials, then it is necessary to remove from the system those materials no longer required. Once the wheel loader has conveyed raw materials to the cold bins, such materials can be removed from the system only by running them through the dryer and vibrator screens into the hot bins. The wheel loader then removes the unwanted materials from the hot bins and returns them to the piles. Only then can the wheel loader begin to convey a new mix of materials into the system through the cold bins.

23. The plant converts from producing one asphalt product to another frequently each day. To minimize the cost that is associated with such conversions of removing unneeded raw materials from the system by running them through the dryer and vibrator screens into the hot bins, Union limits the volume of sand and aggregate entering the cold bins to the amounts needed for the currently scheduled production run. Accordingly, the cold bins are typically filled to an average not exceeding 75% of capacity.

24. The various functions of the wheel loaders include:

a. blending piles of sand and aggregate in order to produce a uniform consistency of sand or aggregate in each pile, as described in paragraph 16;

b. selection and sorting of ingredients in correct amounts and proportions for conveyance to the dryer, or to the weigh hopper, and then to the mixer, as described in paragraph 19;

c. pre-mixing of ingredients in piles outside the cold bins, as described in paragraph 21;

d. removal of unwanted ingredients from the hot bins during a conversion from producing one asphalt product to another, as described in paragraph 22;

e. conveyance of cold mix products from the mixer to the curing piles, as described in paragraph 18;

f. transfer of finished cold mix products from a curing pile to customers' trucks, as described in paragraph 18.

25. The parties agree that functions c and d in paragraph 24 constitute direct use of the loaders in manufacturing, and that function f in paragraph 24 does not constitute direct use of the loaders in manufacturing.

26. Petitioner contends that functions a, b, and e in paragraph 24 constitute direct use of the loaders in manufacturing. Respondent contends that functions a, b, and e in paragraph 24 do not constitute direct use of the loaders in manufacturing.

27. Union does not maintain books and journals that would evidence the percentage of the wheel loaders' time devoted to each of functions a through f in paragraph 24. Union's employees would testify that function b in paragraph 24 constitutes more than 50% of the wheel loaders' time.

28. Petitioner contends that function b in paragraph 24 constitutes direct use of the wheel loaders in manufacturing. Because function b constitutes more than 50% of the wheel loaders' time, Petitioner therefore contends that the wheel loaders are predominantly directly used in manufacturing.

29. Petitioner contends that function a in paragraph 24 constitutes the first operation in the manufacturing process. Substantially all other use of the wheel loaders therefore involves the transportation, conveyance or handling of partially manufactured product, which is considered direct use in manufacturing under Section 32.32(a)(2)(i) of the Sales and Use Tax Regulations. Petitioner therefore contends that the wheel loaders are predominantly directly used in manufacturing.

30. If the Court finds that the wheel loaders are predominantly directly used in manufacturing, then the assessment, as determined by the Board of Finance and Revenue, should be reduced to $0.00.

31. If the Court finds that the wheel loaders are not predominantly directly used in manufacturing, then the assessment, as determined by the Board of Finance and Revenue, should be upheld.

32. The parties hereto reserve the right to introduce other and further evidence either by supplemental stipulations or

testimony not inconsistent with the facts herein contained and the right to object to the relevancy and/or materiality of any facts herein contained."

Further, the Court makes the following additional findings of fact:

## ADDITIONAL FINDINGS OF FACT

33. John H. Rath, employed by Glasgow, Inc. and involved in the production of asphalt products for forty-nine years, testified on behalf of Union Paving at the evidentiary hearing held September 23, 1991.

34. Mr. Rath's testimony essentially described and confirmed the processes iterated in detail in the foregoing stipulation of facts. The Court finds Mr. Rath's testimony to be credible.

35. The manufacturing process begins at the point that the wheel loader blends the individual aggregates, which is necessary to the manufacturing operation in order to assure the degree of uniformity required by customer specifications (as more fully described in Stipulation of Fact No. 16).

36. Mr. Rath testified that this blending process is required in many, if not most, cases prior to the wheel loader putting any one of the aggregates into the cold bins.

37. The wheel loaders then transport the properly blended materials in the proportions specified by the plant operator for the production of a particular paving product from their respective piles and, in the case of RAP, deposit the RAP into the RAP bin, which empties onto the RAP conveyor belt running to the weigh hopper, or in the case of sand or aggregates, deposit those materials into a set of cold bins, which empty on to a conveyor belt running to the dryer. The Court finds that this activity also constitutes manufacturing.

38. The type of paving product being manufactured may change several times throughout a given day whereby the wheel loader operator must be in constant communication with the plant operator via two-way radio to ascertain that the proper proportions of materials are placed into the bins.

39. Mr. Rath testified that when a particular product requires a greater number of aggregates than the number of cold bins at the plant, the wheel loader is utilized to mix in the proper proportions two different aggregates to be placed into a single bin.

40. More than 50% of the wheel loader's time is spent performing the process described in finding of fact 37.

41. All other use of the wheel loaders predominantly involve the necessary transportation, conveyance or handling of the aggregates as part of the manufacturing process.

42. The Court finds specifically that functions a, b, and e in paragraph 24 constitute direct use of the loaders in manufacturing.

## CONCLUSIONS OF LAW

1. The wheel loaders are predominantly directly used in the manufacturing of bituminous paving materials at Union Paving's asphalt plant.

2. Pursuant to Sections 201(c), 201(k), and 201(o) of the Code, 72 P.S. §§ 7201(c), 7201(k), and 7201(o), the wheel loaders, replacement parts therefor, and fuel oil consumed in the wheel loaders qualify for exclusion from Pennsylvania Sales and Use Tax.

The Commonwealth argues that the wheel loaders are predominantly used *prior* to the beginning of Union Paving's manufacturing activities or in the pre-manufacturing process. It is the Commonwealth's position that "manufacturing does not begin until the first combination or mixing of raw materials occurs."

Section 201(c) of the Code, in relevant part, defines "manufacture" as follows:

> The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not limited to—

(1) Every operation commencing with the first production stage and ending with the completion of personal property having the physical qualities (including packaging, if any, passing to the ultimate consumer) which it has when transferred by the manufacturer to another[.]

72 P.S. § 7201. Further, Section 201(k), defining "sale at retail," excludes from that definition "machinery and equipment and parts therefor and supplies to be used or consumed by the purchaser directly in any of the operations of—(A) The manufacture of personal property." 72 P.S. § 7201(k)(8). Finally, Section 201(o) of the Code, defining "use," excludes from the definition of use "[t]he use or consumption of tangible personal property, including but not limited to machinery and equipment and parts therefor, and supplies ... directly in any of the operations of—(i) The manufacture of personal property[.]" 72 P.S. § 7201(o)(4).

 It is well settled that the rule of construction governing exclusions in tax statutes is "that exclusions are to be strictly construed against the taxing body to the extent that there is any reasonable doubt regarding the meaning of the statutory language." *Ernest Renda Contracting Co., Inc. v. Commonwealth*, 516 Pa. 325, 334, 532 A.2d 416, 420 (1987). The issue herein, being one of first impression in Pennsylvania, requires that we look closely at the relevant statutory language. In that regard, the Department's regulations at 61 Pa.Code § 32.32(a)(1) and (2) provide as follows:

(1) **Direct use.** In determining whether property is directly used, consideration shall be given to the following factors:

(i) The physical proximity of the property in question to the production process in which it is used.

(ii) The proximity of the time of use of the property in question to the time of use of other property used before and after it in the production process.

(iii) The active causal relationship between the use of the property in question and the production of a product. The fact that particular property may be considered essential to the conduct of the business of manufacturing or processing because its use is required either by law or practical neces-

sity does not of itself, mean that the property is used directly in the manufacturing or processing operations.

(2) **Property directly used; predominant use.** The purchase or use by a manufacturer or processor of property in the following categories, when predominantly used directly in manufacturing or processing, shall be exempt from tax. Where a single unit of the property is put to use in two different activities, one of which is a direct use and the other of which is not, the property may not be exempt from tax unless the manufacturer or processor makes use of the property more than 50% of the time directly in manufacturing or processing operations.

(i) **General.** Machinery, equipment, parts and foundations therefor, and supplies which are used in the actual production or to transport, convey, handle or store the product from the first production operation to the time the product is packaged for the ultimate consumer are considered to be directly used in manufacturing-processing operations. Repair parts which are installed and become an integral part of such property shall also be exempt from tax.

Union Paving argues that the wheel loaders are used in direct physical proximity to the remainder of the production process; that its operations are immediately proximate in time to the use of other property directly used in manufacturing; and that the wheel loaders have a direct and active causal relationship to the production of the product.

As a practical matter, the individual materials utilized undergo preparation during the blending process before they are placed into the bins. The result is a uniform size and weight of aggregate, which is essential to the required standardization of product. Without the wheel loaders, there could be no mix specifications or constancy of finished product.

The Commonwealth would have us adopt an extremely narrow interpretation of Section 201(c) of the Code to the effect that *every stage of the production process,* i.e., from the "first production stage" to the "completion of personal property having the physical qualities ... it has when transferred by the manufacturer to another," would have to place the person-

al property in a form different from the form in which it was acquired. Such an interpretation is inconsistent with the inclusion of product packaging within the definition of "manufacture" in Section 201(c), since under the Commonwealth's interpretation, packaging would not change the "form, composition or character" of the product.

Clearly, when considering the factors set forth by the Department at 61 Pa.Code § 32.32(a)(1) for determining whether the wheel loaders are directly used, the wheel loaders meet the criteria in all respects.

In accordance with the foregoing, we reverse that part of the Board's order which affirmed the use tax assessment on wheel loaders and replacement parts in the amount of $16,-831.17 and the use tax assessment on fuel oil consumed in the wheel loaders in the amount of $6,428.36, and those amounts due are hereby reduced to zero.

## ORDER

AND NOW, this 4th day of June, 1992, the order of the Board of Finance and Revenue is reversed only insofar as it affirmed the use tax assessment on wheel loaders and replacement parts in the amount of $16,831.17 and the use tax assessment on fuel oil consumed therein in the amount of $6,428.36. Those amounts are hereby reduced to zero.

The Chief Clerk is directed to enter judgment in this matter within thirty (30) days unless exceptions are filed pursuant to Pa. R.A.P. 1571(i).